```
                    UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF VERMONT

UNITED STATES OF AMERICA          )       CRIMINAL ACTION NO.
                                  )       2:19-cr-66-1
        vs.                       )
                                  )
JEREMIAH RUHL,                    )
           Defendant.             )




            HEARING ON VIOLATION OF CONDITIONS OF RELEASE
                       Thursday, July 1, 2021
                         Burlington, Vermont




BEFORE:

     THE HONORABLE WILLIAM K. SESSIONS III,
     District Judge




APPEARANCES:

JOSEPH A. PERELLA, ESQ., U.S. Attorney's Office, 11 Elmwood
     Avenue, 3rd Floor, P. O. Box 570, Burlington, VT
     05402-0570, Counsel for the Government

MICHELLE ANDERSON BARTH, ESQ., Law Office of Michelle Anderson
     Barth, P. O. Box 4240, Burlington, VT 05406, Counsel for
     the Defendant

SHAWNA LAPIERRE, U.S. PROBATION

JEREMIAH RUHL, DEFENDANT
```

Johanna Massé, RMR, CRR
Official Court Reporter
P. O. Box 5852
Burlington, VT 05402
802-951-8102 | 802transcripts@gmail.com

```
 1  Thursday, July 1, 2021
 2       (The following was held in open court at 2:04 PM.)
 3           COURTROOM DEPUTY:  Your Honor, this is criminal number
 4  19-66, defendant number 1, United States of America vs.
 5  Jeremiah Ruhl.  The Government is present through Assistant
 6  United States Attorney Joseph Perella.  The defendant is
 7  present with his attorney, Michelle Anderson Barth.
 8       The matter before the Court is a violation of conditions
 9  of release.
10           THE COURT:  All right.  Ms. Barth, have you received a
11  copy of the petition for a violation of conditions of release?
12           MS. BARTH:  I have, your Honor.  I've gone over it
13  with Mr. Ruhl, and he also has a copy in front of him.
14           THE COURT:  Okay.  And does he admit or deny the
15  violations?
16           MS. BARTH:  He admits to the violations, your Honor.
17           THE COURT:  Okay.  Mr. Ruhl, would you stand, please.
18      I'm going to ask you a whole series of questions.  If you
19  don't understand anything that I ask, let me know.  I'd be glad
20  to explain.  If you wish to speak with Ms. Barth, let me know
21  that.  I'll provide you an opportunity to speak with her.  Do
22  you understand that?
23           THE DEFENDANT:  I do, your Honor.
24           THE COURT:  I'm also going to ask that you be placed
25  under oath and would advise you if you answer any questions
```

falsely, you could be prosecuted for perjury or false swearing. Do you understand that?

THE DEFENDANT: Yes, I do.

THE COURT: Would you place Mr. Ruhl under oath, please.

(The defendant was sworn.)

THE DEFENDANT: I do.

THE COURT: All right. Would you place your mic -- actually, you can probably sit and speak right into the microphone.

THE DEFENDANT: Okay.

THE COURT: Okay? Would you state your full name.

THE DEFENDANT: Jeremiah David Ruhl.

THE COURT: Is that microphone on, I wonder?

MS. BARTH: It's got the little green light on.

THE DEFENDANT: Jeremiah David Ruhl.

THE COURT: All right. And how old are you?

THE DEFENDANT: Forty-six.

THE COURT: How far did you go through school?

THE DEFENDANT: I graduated high school and went to several colleges.

THE COURT: Have you ever been hospitalized for drug or alcohol treatment?

THE DEFENDANT: No.

THE COURT: Are you currently or recently under the

1  care of a physician or therapist?
2          THE DEFENDANT:  Yes.
3          THE COURT:  Which one?
4          THE DEFENDANT:  Dr. Tony -- my primary care doctor.
5          THE COURT:  Okay.  Are you receiving any medication?
6          THE DEFENDANT:  Yes, your Honor.
7          THE COURT:  What's the medication?
8          THE DEFENDANT:  There's one for chest congestion for
9  liquid that's still -- from pneumonia; an inhaler; and some
10 pain medicine as well.
11         THE COURT:  And when did you last take those
12 medications?
13         THE DEFENDANT:  Just before I came in the courtroom.
14         THE COURT:  Okay.  Do they impact your ability to
15 understand what's happening today?
16         THE DEFENDANT:  No, not at all.
17         THE COURT:  Do you understand what's happening today?
18         THE DEFENDANT:  Yes, I do.
19         THE COURT:  All right.  Have you received a copy of
20 the petition -- do we have a copy of that petition?
21         MR. PERELLA:  I have a copy, hard copy, your Honor, if
22 you need it.
23         THE COURT:  Do you have a hard copy?
24         MR. PERELLA:  Yes.  May I approach?
25         THE COURT:  Yes.

1    All right. Have you received a copy of the violation
2 report?
3           THE DEFENDANT: Yes, I have.
4           THE COURT: And have you had an adequate opportunity
5 to go over that violation report with Ms. Barth?
6           THE DEFENDANT: Yes, your Honor. We did last night.
7           THE COURT: The allegations are that you failed to
8 appear for scheduled drug testing on June 2nd, 2021; June 4;
9 June 9; and June 11. Do you understand that?
10          THE DEFENDANT: Yes, I do, your Honor.
11          THE COURT: And also that at approximately 8:30 PM on
12 June 11th you were involved in a scooter accident after a
13 suspected medical event and you were found in possession of
14 narcotics in your wallet, and heroin was the narcotic. Do you
15 understand that?
16          THE DEFENDANT: Yes, your Honor.
17          THE COURT: Do you understand that you have a right to
18 a full hearing; at that hearing, you'd have the right to the
19 assistance of counsel for your defense, the right to see and
20 hear all witnesses, have them cross-examined in your defense,
21 the right on your own part to decline to testify unless you
22 voluntarily chose to do so, the right to the issuance of
23 subpoenas to require the attendance of witnesses to testify in
24 your defense, the right to testify, the right to present
25 evidence; but that you -- if you admit to the allegations, you

1 waive your right to a hearing and the other rights I've just
2 explained, there will be no hearing, I'll accept your
3 admission, and impose sentence -- or, actually, address the
4 issue of detention.  Do you understand that?
5            THE DEFENDANT:  Yes, I do, your Honor.
6            THE COURT:  And do you admit that you failed to appear
7 at the various dates in June for urinalysis testing and that
8 also you were found on June 11th to be in possession of heroin?
9            THE DEFENDANT:  Yes, your Honor.
10            THE COURT:  All right.  The Court will accept your
11 admission, find that you are making the admission freely and
12 voluntarily.
13       Now, we need to address the question about termination of
14 your participation in drug court in light of these allegations.
15 You had been suspended from drug court in advance, and the
16 order of drug court was that you would appear for urinalysis
17 testing Mondays, Wednesdays, Fridays from that date forward,
18 and here obviously you admitted to violating that provision as
19 well as being in possession of heroin, and as a result, you're
20 terminated from drug court.
21       Now the question of detention or release, and what's the
22 Government's position?
23            MR. PERELLA:  As to the first question, your Honor,
24 the Government believes termination from drug court is
25 appropriate.  We have tried many things.  I don't need to go

1 through the chronology, but the bottom line is we've given Mr.
2 Ruhl lots of opportunities, and he just hasn't followed through
3 with his end of the bargain, for whatever reason.
4     And as to detention or release pending sentencing, first
5 it appears from talking to Probation Officer Bonneville that
6 the draft PSR won't be done for 45 to 60 days, a draft.
7 Preliminary calculations, depending on criminal history, Mr.
8 Ruhl's guidelines could be 15 to 21 months or 21 to 27 months.
9     That said, your Honor, but for the medical issues, the
10 Government would strongly recommend detention pending
11 sentencing.  Given the medical issues Mr. Ruhl is facing, which
12 I think Mr. Ruhl himself has to convince the Court it justifies
13 release, but in light of those, the Government defers to the
14 Court on whether detention is appropriate pending sentencing.
15     It appears at the minimum GPS monitoring and a very strict
16 schedule would be required.  I think most concerning is driving
17 for Mr. Ruhl and, if he is released pending sentencing, that
18 we'd ask the Court to address that with additional restrictions
19 on when he can drive and for what purpose.
20     Thank you, your Honor.
21         THE COURT:  Okay.  All right.
22     Ms. Barth?
23         MS. BARTH:  Thank you, your Honor.
24     As to the first question on termination, Mr. Ruhl would
25 like to remain in our drug court program.  His progress has

been uneven, but he has at times shown some real progress.  At least in the last 30 days, while he has been in suspended status, for the most part he's done very well.

As Mr. Ruhl said, he's been eating, breathing, living drug court.  It was after he suffered a series of catastrophic events with his heart that he was not himself.  It began with his electrocution with the lightning that sent his heart into arrhythmia.  In the week prior to that incident, he was having heart issues.  He still doesn't have a diagnosis, but he was not himself.

On the dates that he missed his UAs, he's put together a timeline, and it looks like he had medical appointments that he attended or was dealing with crises related to his low blood pressure or high blood pressure.  He has spikes that are unexplained.

When he had the accident, he was in a blackout state, and as your Honor knows, CPR brought him back to life.

He was not himself in the last week, but in the three weeks --

THE COURT:  Well, CPR or it was Narcan.

MS. BARTH:  It's true that a can of Narcan was used, but it seems that the drug use may not have been connected to his heart issue.  He has a blood pressure cuff, and he has a monitor that he's supposed to have put on his chest today, this afternoon.  He has blood work that's been ordered by his doctor

1  in the coming days.  He's in a real health crisis right now,
2  and when he does have an opportunity to speak, you'll see he
3  has fluid in his lungs.
4        He would be better off being served by the medical
5  professionals who are intimately aware of his situation and can
6  provide the quickest diagnosis and prognosis for him.
7        He's willing to submit to whatever stringent conditions
8  the Court would impose.  GPS monitoring seems appropriate.  A
9  sweat patch seems appropriate.  A curfew seems appropriate.
10 All of which I think you can trust he will follow.  With the
11 health issues, it seems that he needs at least some time to
12 address those.
13       He also has a business, as you know, your Honor, with his
14 fencing company.  He'd like an opportunity to be able to have
15 that work distributed to other people or return people's
16 security deposits.  He's trying to responsibly close out his
17 business as well.
18       So I know he has quite a bit he wants to share with the
19 Court as well, but our proposal would be not to detain him at
20 this time, ask the Court to reconsider his continuation in our
21 drug court program in light of those periods of time in which
22 he's done well, and to impose stringent release conditions so
23 that he can continue with his medical care and at least get
24 through this crisis.
25            THE COURT:  Okay.  All right.  Mr. Ruhl, do you wish

1 to make a statement?

2     THE DEFENDANT: Yes, your Honor. Is it all right if I
3 stay sitting down?

4     THE COURT: Yes.

5     THE DEFENDANT: Okay. So as far as the urinalysis
6 goes, I was either -- I was in the hospital during those days.
7 I remember being in the hospital; I had a blood pressure spike,
8 and I was brought up to the emergency room, and all I cared
9 about was that I had missed a UA, and I kept telling the
10 doctors that -- that that was the most important thing at the
11 time, and I wasn't talking about my heart or how I felt. That
12 was the only thing on my mind. And finally one of the nurses
13 came in and said they could pull some blood -- they were going
14 to take blood anyway and they could do a tox panel and I could
15 give that to my probation officer because I missed a UA. And
16 then once they said that, I relaxed and started focusing on my
17 health crisis. And that happened a couple of times. So a
18 couple of the UAs that I have, I have a tox panel from my blood
19 that shows that I haven't used any drugs.

20     I think that there was a UA that I missed from -- I was on
21 my way there and I got bit by a dog, and I was there -- I
22 remember being there the next morning when they opened up so
23 that it didn't look like I was trying to put a lot of time
24 between my UAs. I was there before they even opened. I waited
25 for them to get there and I went and did the UA.

```
 1              THE COURT:  There are four UAs that you missed.
 2              THE DEFENDANT:  Okay.  And I had -- I had no idea that
 3   I missed any UAs until Michelle had spoken -- had told me
 4   yesterday, because --
 5              THE COURT:  Well, you certainly -- you certainly knew
 6   that on Mondays, Wednesdays, and Fridays you were expected to
 7   take a UA because that was one of the conditions --
 8              THE DEFENDANT:  Absolutely.
 9              THE COURT:  -- that the Court imposed when it
10   suspended you from the drug court, and then within a couple of
11   weeks, two to three weeks, here we have numerous identified UA
12   requirements violated.
13              THE DEFENDANT:  Right.
14              THE COURT:  And what you're saying is that you didn't
15   recognize or know that you were supposed to go?
16              THE DEFENDANT:  I didn't, your Honor, because from
17   what I've explained -- the way it's been explained to me is
18   that my heart was already in arrhythmia and I was getting less
19   oxygen to my heart and my brain.  I made a phone call to Shawna
20   specifically to explain to her about the UAs, and we ended up
21   talking about getting bit by a dog and getting electrocuted in
22   the shower by lightning, and I just -- just really foggy -- I
23   just didn't remember to tell her that once we started talking.
24        And all my friends, my people, my family that I've been
25   around, customers, they knew that I wasn't myself, and towards
```

1 the end of the week before my cardiac arrest, I thought that I
2 was in the Marines and that my friends -- this was on a
3 Thursday.  I was talking to my cousin, and I was talking about
4 how a friend of mine just committed suicide.  His name was
5 Taylor.  And that happened ten years ago.
6      I didn't use any heroin before the accident or after the
7 accident or -- and I thought that possession of heroin -- the
8 fact that I went to get the heroin, that the drug team and the
9 Court would look at that and say, "Well, clearly he wasn't --
10 he wasn't there.  He wasn't in his right mind."  Because that's
11 just so out of character for me.  I would never, ever, ever use
12 heroin again.  So I just feel like --
13           THE COURT:  Well, then you had a positive test for
14 cocaine --
15           THE DEFENDANT:  Right.
16           THE COURT:  -- in the hospital.
17           THE DEFENDANT:  And I did my own -- I was told that by
18 Shawna.  I didn't know that I had heroin on me.  I didn't know
19 that I used cocaine.  I -- literally, I wasn't -- not
20 literally, but I wasn't there in my mind.  I was, like, ten
21 years earlier, I guess.  I don't remember any of it.  But --
22 and the doctors have explained it to me that that's -- that can
23 happen.  I'm not hiding behind this.  I just -- I wasn't there.
24           THE COURT:  Okay.  Well, all right.  So there's two
25 major concerns that I have.  The first is you know that you're

1  really in flagrant violation of the Court's order.  I
2  specifically told you that you had to go to UAs, you had to go
3  to UAs three times a week.  And even before the accident here
4  in which you were found in possession of heroin, you missed
5  those.  You know, maybe it's some confusion or the arrhythmia
6  which may have resulted in that, and certainly if there's
7  something in the medical records which confirms that, I would
8  be glad to reconsider.  But what I'm faced with is, number one,
9  a pretty flagrant violation of the Court's order.
10       The second is -- is beyond that.  I have real concern
11 about your safety.  I mean, this is not the first time this
12 happened.  If you just accept what you have said about blacking
13 out, about no memory of what happened in a day -- there's no
14 head injury here.  This is not as a result of an accident so
15 that you don't remember what happened in the past.  For some
16 reason you have had very significant interruptions in your
17 health, and it's related, frankly, it seems to me, to the use
18 of drugs.  Your test is positive for cocaine.  Whether or not
19 you had heroin or not, it seems to be all connected.
20        And then we see from the police officers that you're given
21 Narcan, and basically your life may very well have been saved
22 by Narcan.  So --
23            THE DEFENDANT:  It wasn't.  That was their mistake.
24            THE COURT:  Well, maybe -- maybe it was their mistake
25 or maybe it wasn't.  I'm unclear.  And frankly, you know, when

1  you put those two factors in combination, the fact that you
2  flagrantly violated the Court's order but then, you know, even
3  if it was caused in part by something that happened to you, it
4  seems to me that right now you're in serious risk.  I mean,
5  right now when you're facing the potential of a prison sentence
6  with your history, I don't know what happens.  It's -- you
7  know, it just -- for your own good, it seems just to be a
8  really significant concern.
9            THE DEFENDANT:  I'm not in risk of using drugs at all.
10           THE COURT:  Well, how do I know that?
11           THE DEFENDANT:  I wasn't in risk of using drugs until
12 I was hours before cardiac arrest.  I'm not at that risk right
13 now because I'm on medication to keep my heart lower until they
14 figure out what's going on.  It would have taken something
15 catastrophic, like being hit with lightning, to make me use
16 drugs during that 30-day period or any other time in my life
17 from here on out now that I have a heart condition, just like
18 in the way that it's off the table unquestionably that I can
19 ever use opiates again, specifically heroin, because I'll
20 probably die.  It's like that with cocaine.  It's just -- it's
21 off the table.  It's not -- it can't happen.  It won't happen.
22 It never would have happened if -- you know, if I wasn't in
23 that health crisis.  There's no way.  I would never miss UAs.
24      And if I can put together the -- the -- I'm having trouble
25 putting my words together.  It's been like this since -- since

1  my heart attack, but if I have the time to get the evidence
2  from the doctors that I was there when I was supposed to be
3  doing my UAs and that it was important to me that I made sure
4  that I had some documentation that was just as good as a UA, I
5  would just like to have a chance to present that to you.
6          THE COURT:  Okay.  All right.  So what I'm going to do
7  is schedule another hearing.  I'd like to get all his medical
8  records.  I'd like to see if there's any justification for this
9  claim that perhaps he was struck by lightning.  And this is to
10 be set up next week in short notice.  So I'd ask for all of his
11 records to be submitted and reviewed.  I'd like to figure out
12 what exactly is happening.  And if in fact the medical records
13 suggest, as it may very well be, that this is all related to
14 the use of drugs, then that's a totally different situation.
15      In the meantime, I'm going to order him released subject
16 to GPS monitoring.  Can that be set up quickly?
17          MS. LAPIERRE:  Yes, your Honor.  We can start that
18 today.
19          THE COURT:  Okay.  And location -- location monitoring
20 in his place, probably not, right?
21          MS. LAPIERRE:  We'll have to see, your Honor.  It does
22 work on GPS satellite, so depending -- it's not on cell
23 service, so depending on how good a satellite reception he gets
24 at his place, we'll have to determine that.
25          THE COURT:  Okay.  What I'm really concerned about is

1  what impact incarceration would have at this particular moment
2  on his medical condition, and so I need to know all of that.
3  And I don't want to run the risk of him not being able to get
4  medical care that he needs at this particular point within a
5  very short period so that we can address it next week.
6         As far as his continued involvement in drug court, that's
7  terminated.  He's not to participate in drug court.
8         And further, he's on straight conditions of release, and I
9  really -- I just want to make sure that the medical records
10 confirm what's best for him, including, you know, a
11 recommendation from his, I guess, cardiologist, you know,
12 what -- what happens next.  He's supposed to be on monitoring
13 at this point.  I just don't know what impact incarceration
14 would have.  So we'll schedule this for sometime next week, and
15 I'd like to get all of those records at this point.
16            MS. BARTH:  We will certainly do our best, your Honor,
17 to get those records for you.
18            THE COURT:  And this will give you some time to
19 straighten out all your business issues.  It's with some risk
20 here, because I'm really concerned that you are at risk at this
21 point.
22            THE DEFENDANT:  I'm not, your Honor.  Okay.
23            THE COURT:  All right.  So let's technically change
24 the conditions of release, that he's to get GPS monitoring and
25 that he has to report -- turn over all of his medical records

1 so that we can take a look at exactly what is happening with
2 him, and then we'd have a rehearing next week.
3            MS. BARTH:  Your Honor, I just wanted to bring one
4 matter to the Court's attention.  I am out of town as of
5 Thursday of next week, so I just wanted to let you know about
6 that.
7            THE COURT:  Right.  Yeah.  And this may very well be
8 by Zoom, so we'd be talking about Wednesday --
9            MS. BARTH:  Okay.
10           THE COURT:  -- probably.
11           MS. BARTH:  Thank you.
12           MS. LAPIERRE:  Your Honor, could you please clarify
13 what you would like him to do for UAs?  Do you still want the
14 three times a week, or do you want it to be at Probation's
15 discretion?
16           THE COURT:  That order still is in place.
17           MS. LAPIERRE:  Okay.
18           THE COURT:  He still is supposed to be doing UAs
19 Mondays, Wednesdays, and Fridays.
20           MS. LAPIERRE:  And a clarification as to if you want
21 home detention or curfew.  Home detention would mean he would
22 be at his home at all hours and only approved to leave for
23 certain times or events.  A curfew would be he can be gone
24 during the day between whatever hours Probation sets.
25           THE COURT:  My feeling is a curfew would be better

1  than home detention, because he works.
2          MS. LAPIERRE:  Right.
3          THE COURT:  So I would say 7:00 to 7:00.
4          MS. LAPIERRE:  7:00 to 7:00.  Very good.
5          THE COURT:  Okay.
6          MS. BARTH:  Thank you, your Honor.
7          THE COURT:  Okay.  All right.  Thank you.
8       (Court was in recess at 2:31 PM.)
9
10
11                  C E R T I F I C A T I O N
12     I certify that the foregoing is a correct transcript from
13  the record of proceedings in the above-entitled matter.
14
15
16  February 7, 2022                    _____
                                        Johanna Massé, RMR, CRR
17
18
19
20
21
22
23
24
25