UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

UNITED STATES OF AMERICA     *
                             *
            V                *
                             *
JED RUHL                     * CRIMINAL FILE NO. 19-66

SENTENCING
Monday, November 1, 2021
Burlington, Vermont

BEFORE:

    THE HONORABLE WILLIAM K. SESSIONS III
        Senior District Judge

APPEARANCES:

    JOSEPH R. PERELLA, ESQ., Assistant United States
        Attorney, Federal Building, Burlington, Vermont;
        Attorney for the United States

    STEVEN L. BARTH, ESQ., Assistant Federal Public
        Defender, Office of the Federal Public Defender,
        District of Vermont, 95 Pine Street, Suite
        150, Burlington, Vermont; Attorney for the
        Defendant

ANNE NICHOLS PIERCE
United States District Court Reporter (ret'd.)
*fortherecordinvermont@gmail.com*

```
1    MONDAY, NOVEMBER 1, 2021
2    (The following was held in open court at 10:38 a.m.)
3              THE COURT:  Okay.  Good morning.
4              MR. PERELLA:  Morning, your Honor.
5              MR. BARTH:  Morning, your Honor.
6              COURTROOM DEPUTY:  Your Honor, this is
7    criminal number 19-66, defendant number one, United
8    States of America versus Jeremiah Ruhl.  The government
9    is present through Assistant United States Attorney
10   Joseph Perella.  The defendant is present with his
11   attorney, Assistant Federal Public Defender Steven
12   Barth.
13       The matter before the Court is sentencing.
14             THE COURT:  All right.  Mr. Barth, have you
15   received a copy of the presentence report?
16             MR. BARTH:  I have, your Honor.
17             THE COURT:  And have you gone over that report
18   with Mr. Ruhl?
19             MR. BARTH:  Yes, your Honor.
20             THE COURT:  Did you see any factual mistakes
21   in the report?
22             MR. BARTH:  No, your Honor.
23             THE COURT:  Okay.  Mr. Ruhl, have you read the
24   report?
25             THE DEFENDANT:  Yes, I have, your Honor.
```

1            THE COURT:  And have you gone over the report

2     with your lawyer?

3            THE DEFENDANT:  Yes, I did, your Honor.

4            THE COURT:  Did you see any factual mistakes

5     in the report?

6            THE DEFENDANT:  Um, no, your Honor.

7            THE COURT:  Okay.  Mr. Perella, any factual

8     errors?

9            MR. PERELLA:  No, your Honor.

10           THE COURT:  All right.  I have read the

11    presentence report.  I have read the sentencing

12    memoranda of both the government and the defense.  There

13    are a number of issues related to the criminal history

14    score that Mr. Ruhl has recommended -- has been

15    recommended by the probation officer.

16        In particular, there's a question as to whether

17    those two sentencings which both resulted in three-level

18    enhancements -- or three-level criminal history points

19    should be considered at the same time, a total of six;

20    or, because the sentencing date was the same and there

21    is a separation by way of citation, whether that means

22    it should be three points as opposed to six.  Apparently

23    there's a circuit split on this issue.

24        And there's also an issue in regard to one criminal

25    history point for the interlock violation.  That

1    technically apparently is considered DLS violations, so

2    ordinarily that would continue to be a one-point

3    violation because of Vermont's two-year maximum on a DLS

4    conviction.  Anyway, there's issues in regard to

5    criminal history score.

6        There's also a request for a non-guideline sentence

7    based upon the criminal history score of six

8    overrepresenting the seriousness of his criminal past;

9    and also a request for a non-guideline sentence by the

10   defense in general.

11       So those are the issues that are outstanding.  Is

12   that correct?

13           MR. BARTH:  Yes, your Honor.  There is one

14   other issue outstanding related to --

15           THE COURT:  The condition of hunting.

16           MR. BARTH:  Correct.

17           THE COURT:  And his supervised release.

18           MR. BARTH:  Yes.

19           THE COURT:  Okay.  Yeah.  No, I saw that as

20   well, but that's related to the conditions of supervised

21   release.

22           MR. BARTH:  And if I may, your Honor:  Just to

23   be clear, we have two guideline challenges to the

24   criminal history scores.  One dealt with paragraph 55

25   and 56, which actually is a two-pointer and a

1    one-pointer.

2             THE COURT:  All right.  Right.

3             MR. BARTH:  And the other --

4             THE COURT:  It's the same basic issue, but,

5    right.

6             MR. BARTH:  Yes.  The issue --

7             THE COURT:  Yeah.

8             MR. BARTH:  -- you nailed -- you have referred

9    to them as three-pointers, and it's a two and a one.

10   And then --

11            THE COURT:  Actually, I thought -- I thought

12   it related to -- no.  I guess -- I'm sorry.  I guess

13   that is two and one.  All right.

14       Well, no.  Paragraph 65 and 66.

15            MR. BARTH:  As far as I could tell, they were

16   sentenced on different dates, your Honor.  Perhaps

17   Mr. Bonneville --

18            THE COURT:  Oh, no.  Right.  No.  That's

19   correct.  So it's the two and the one.  Okay.

20            MR. BARTH:  Thank you, your Honor.

21            THE COURT:  Okay.

22            MR. BARTH:  And I also challenge paragraph 69.

23   The Court is correct; the probation officer correctly

24   pointed out that the sentencing provision of an

25   interlock defense does relate back to a DLS offense,

1    which is punishable by up to two years.  So that

2    technically is correct that it should score.  We had

3    challenged that, and that was my oversight.  I believe

4    that was a misdemeanor under both federal law as well as

5    the state law.  But it is not.

6                THE COURT:  All right.  To resolve the issues,

7    I guess, prior to argument, I have read the memoranda

8    that's submitted by both sides.

9        The government also feels that criminal history

10   category six overrepresents the seriousness of Mr.

11   Ruhl's past.  So both sides agree that criminal history

12   category six should not be applied.  The defense is

13   requesting criminal history category three.

14       In light of, you know, for instance, those six

15   points stemming out of very similar dates and -- old

16   dates, frankly, as well as the prevalence of driving

17   offenses, it seems to me that the criminal history

18   category six overrepresents the seriousness of his

19   conduct and criminal past, and will reduce -- as a

20   matter of discretion, will reduce the criminal history

21   category to three.  I think that is an appropriate

22   criminal history score for Mr. Ruhl's past.

23       So I am not going to address that whole interesting

24   question about whether the separation in offenses that

25   are sentenced on the same date but separated by citation

1    means there should be similar -- should be a similar

2    criminal history score.  I am just going to indicate

3    that it's criminal history category three.  I think

4    that's fair.

5            MR. BARTH:  Very well, your Honor.

6            THE COURT:  All right.

7            MR. PERELLA:  No objection, your Honor.

8            THE COURT:  Okay.  All right.  So -- now, you

9    have requested a non-guideline sentence, and I will hear

10   you on that.

11           MR. BARTH:  Thank you, your Honor.

12       One of the issues that I find most telling about

13   this is the guideline range is relatively high for the

14   possession of the firearm.  However, that is due in

15   large part to the criminal history, which has been

16   addressed by the Court, but it's also due to the fact

17   that he was a felon in possession who was not using the

18   gun for lawful sporting purposes.

19       Had the lawful sporting purpose specific offense

20   characteristic applied, Mr. Ruhl's base offense level

21   would have been reduced to a six.

22       Now, I think the probation officer is correct that

23   because during this time period the shotgun in question

24   was used to hunt the migratory or migratory birds out of

25   season or without approval, that reduction, based on a

1    specific offense characteristic, does not technically

2    apply.  But that reduction, based on that specific

3    offense characteristic, is a recognition that certain

4    people, when they use firearms illegally, simply due to

5    their status as a prohibited person, are outside of the

6    category to a good degree of the type of person Congress

7    envisioned when they authored and passed 922(g).

8        The type of person who is prohibited from

9    possessing a firearm is a person who is dangerous, is a

10    danger to the community.  And that is reflected

11    oftentimes in the charges that accompany a 922(g).

12    Often people are caught with a drug because they are

13    dealing drugs.  Often they are in the process of robbing

14    or threatening other people to further their criminal

15    behavior.  That's not the case here.

16        Mr. Ruhl's criminal behavior, outside of simply

17    being a prohibited person, was that he hunted birds,

18    migratory birds, and that is against the law, and as a

19    result he shouldn't get that specific offense

20    characteristic, or at least he shouldn't get the full

21    eight levels that that specific offense characteristic

22    would subtract from his base offense level.  His base

23    offense level would go from a 14 to a six.

24        So we are not asking for a reduction of eight

25    levels.  We haven't asked for that particular specific

1    offense characteristic to apply.  But we ask the Court

2    to consider the conduct here that Mr. Ruhl was engaged

3    in, the criminal conduct.  That is, he possessed the gun

4    for one purpose and one purpose only:  to hunt, out in

5    the woods, in nature.  And, yes, he hunted a woodcock,

6    he hunted a crow, I believe a turkey vulture, and those

7    are considered migratory bird and thus against the law.

8    But it doesn't change the fact that what Mr. Ruhl was

9    doing was hunting.  He wasn't using that gun for any of

10   the typical dangerous type behavior Congress envisioned

11   when it prohibited any felon to possess a firearm.

12         And that's in keeping with Mr. Ruhl's criminal

13   history.  His criminal history is not ripe with violent

14   acts.  He has not robbed people before.  He has not

15   assaulted -- has not been convicted of crime of

16   violence, your Honor.

17         Mr. Ruhl has accumulated a series of traffic

18   violations, driving under suspended license, and there

19   is a sense that Mr. Ruhl does not often pay heed to the

20   minor types of rules and regulations that apply to

21   everybody, but that doesn't put him in the same type of

22   category as somebody who is dealing drugs and possessing

23   firearms or is planning to rob a pharmacy or a bank or

24   threatens next-door neighbors or domestic partners.

25         Again, what Mr. Ruhl was doing unlawfully was

1    hunting birds.  And he is a hunter, you know, and he

2    can't use firearms anymore, and I think he understands

3    that.  But there is nothing illegal about hunting.  The

4    act itself is not illegal.  In fact, it is, in this

5    state, considered pro-social behavior.

6         When you look at that and you consider what he was

7    doing with the firearm, hunting, which is so important

8    to him and his life and his well-being, his emotional

9    well-being and psychological well-being, I think that a

10   further variance from the guideline range is

11   appropriate.

12        This is one of the few cases that the Court may

13   know my client better than I do.  The Court's spent a

14   significant amount of time with Mr. Ruhl, but my take on

15   Mr. Ruhl --

16             THE COURT:  I do want to say something.  At

17   one point Mr. Ruhl was before the Court on a potential

18   violation in drug court.  I indicated that it was

19   unclear to me whether I should be the judge to impose

20   sentence in light of the fact that my reaction was

21   pretty strong that he violated some of the conditions.

22        I've thought hard about that, and, you know, the

23   fact is that a judge who is the judge in drug court gets

24   to know very well the people before him or her.  And I,

25   you know, concluded that I don't -- I don't feel that my

1    knowledge of Mr. Ruhl that I had developed in drug court

2    would prevent me from imposing sentence.  In fact, it

3    has just the opposite impact.  I get to know people who

4    have been in drug court extraordinarily well, and I

5    think it puts me in a better position to impose

6    sentence.

7         So, you know, I did make a comment that I'm not

8    sure it was appropriate for me to do it in light of Mr.

9    Ruhl's violations, but I have concluded after a whole

10   lot of thought that that was not correct; that I did

11   feel comfortable imposing sentence.

12        Anyway, that's a divergence from your comment about

13   how well a judge in drug court gets to know the people

14   who participate.

15             MR. BARTH:  Yes.  And the thing about drug

16   court is there are very perceptive, intelligent,

17   wonderful attorneys sitting in court paying attention.

18   One of them passed along that comment to me, and there

19   was a conversation that I had with the defense attorney

20   liaison about that comment and what made the most sense,

21   and --

22             THE COURT:  You mean this is your wife that is

23   the attorney in the drug court?

24             MR. BARTH:  Yes.  Yes, she happens to be my

25   wife.

1            THE COURT:  Right.  Okay.

2            MR. BARTH:  So I did not come into this

3    without having sat down, reviewed notes, talked about

4    Mr. Ruhl with Miss Barth, and -- "Miss Barth," it's hard

5    to say.

6            THE COURT:  Yes.  Right.

7            MR. BARTH:  And I guess I would say this:  I

8    trust the Court to use what it has learned about Mr.

9    Ruhl to sentence him appropriately, and if the Court

10   felt that the interactions it had with Mr. Ruhl during

11   the course of the drug court program would affect the

12   Court's ability to sentence within the factors laid out

13   in 3553(a), I think the Court would -- I think the Court

14   would tell us.

15           THE COURT:  I think my contact with Mr. Ruhl

16   during the course of the year that he was in drug court

17   is helpful in the sentencing process because, on the one

18   hand, he obviously violated, which is a negative; on the

19   other hand, he participated for long periods of time

20   while being sober, and he at some times did

21   extraordinarily well.  But eventually his slip of

22   honesty really resulted in him being terminated from

23   drug court, but I tend to think that there have been

24   both positives and negatives that the Court has learned,

25   and I think I can balance those.

1          MR. BARTH:  Yes.  And I appreciate that.

2      I think, you know, before -- before we digressed a

3  bit, what I was saying was I think Mr. Ruhl, you know,

4  has a tendency to trip over his own feet sometimes.  I

5  think he has very good intentions.  I think, you know,

6  from the moment, you know, we were sitting out in the

7  coat room, out in the hallway, you know, two years now,

8  or over two years ago, and -- Mr. Ruhl was very excited.

9  We'd just changed plea and been referred to the drug

10  court, and he was very excited about the opportunity

11  to address some of his issues that earned a time-served

12  sentence.

13      I believed him then.  I still believe that was his

14  intent, that he had every belief that this was going to

15  be good for him and that he would succeed.  And I think

16  that remained true during the course of his drug court

17  term.

18      I think sometimes Mr. Ruhl didn't, you know,

19  understand how he was slipping, that there was some

20  difficulty in recognizing, you know, this -- I wasn't a

21  totally impassive observer.  I spoke with Mr. Ruhl two

22  or three times during that year -- the Court requested

23  that I do that on one or two occasions -- just to say,

24  Hey, we have to right the ship and, you know, every time

25  I spoke to him there was optimism that, you know, things

1    were going to turn around and he felt good about it.

2         And so I do feel that while he didn't succeed, his

3    heart was in the right place, and I'm hopeful that with

4    the help of U.S. Probation and some time under his belt

5    to think about what's going on and a realization that he

6    can spend a significant time in custody for an offense

7    like this, he will -- he will perform well.

8         And so we think, particularly during this time when

9    there's a pandemic, Mr. Ruhl's in custody, that a

10   time-served sentence is -- is most appropriate for him.

11   He has been in custody just about, give or take a week

12   or two, six months at this point.  When you consider the

13   pretrial time in custody prior to his change of plea and

14   now, I think it's been approximately three months he has

15   been in custody since he was last before your Honor, and

16   so we ask for a time-served sentence.

17        If the Court would like, I am happy to address the

18   conditions or --

19             THE COURT:  The Court is going to strike any

20   condition on restricting him in hunting and fishing.  As

21   long as it's consistent with the law, he should be able

22   to hunt and fish.  That means that he cannot be in

23   possession of a firearm.

24             MR. BARTH:  Correct.  And I appreciate that.

25   And the Court knows there's a mandatory condition that

1    prevents him from breaking any federal, state or local

2    law.  That would, of course, cover possession of a

3    firearm, an illegal -- that's illegal for him to

4    possess.  It would also prevent him from hunting or

5    fishing without a license, an appropriately issued

6    license.  So we would ask that the Court allow that.

7         I would also ask that the Court recognize that he

8    may possess lawful black powder firearms for the

9    purposes of hunting.

10        There is a -- there's another condition that says

11   that the defendant is not allowed to possess dangerous

12   weapons.  A black powder rifle certainly could be

13   considered a dangerous weapon.  And in other cases,

14   that's been a part of --

15             THE COURT:  I am not ready to rule on the

16   issue of black powder weapons and supervision.  That

17   could come up at a later time.  This is a question about

18   whether he should be able to get licenses, hunting

19   licenses and fishing licenses.  And, you know, I am not

20   going to impose a sentence that would restrict him from

21   doing that.

22             MR. BARTH:  Very well.

23             THE COURT:  But not the black powder at this

24   point.

25             MR. BARTH:  Perhaps at a later time he can

1    readdress it with the Court.

2                THE COURT:  Okay.

3                MR. BARTH:  Thank you, your Honor.

4                THE COURT:  All right.  Does your client wish

5    to address the Court?

6                MR. BARTH:  I think so, your Honor.

7                THE COURT:  Okay.

8                THE DEFENDANT:  I just wanted to say that I'm

9    regretful for a lot of the -- sorry for a lot of the

10   decisions, bad decisions that I made during drug court.

11               THE COURT:  Well, you made good decisions and

12   you made bad decisions.  And why did you make the bad

13   ones?

14               THE DEFENDANT:  Well, there was -- well, I

15   wrote -- wrote a book throughout drug court, like a

16   memoir of drug court from a participant's perspective.

17   And I think I explain a lot of it in there.  I hadn't

18   thought about trying to explain it right now why I made

19   bad decisions.  Different reasons for different

20   decisions, I guess.

21               THE COURT:  It --

22               THE DEFENDANT:  Drug court is --

23               THE COURT:  You know, the issue that is

24   paramount ultimately in your failure in drug court was

25   your honesty, your, you know, efforts to circumvent all

1    the restrictions that drug court imposes, your efforts

2    to hide drug testing by watering down urine samples, and

3    you attempting to manipulate a way through drug court

4    without really just accepting its basic precepts.

5        I mean, that ultimately was the problem, and

6    it's -- you know, it's a problem that you are going to

7    deal with for the rest of your life, really.  It's a way

8    of looking at obligations not from how can I comply with

9    these obligations; rather, it's looking at it from how

10   can I circumvent the impact of these regulations.

11       And you kept getting tripped up by, you know, this

12   effort to really not follow through with what was

13   required.  And, you know, ultimately you are the one who

14   suffers.  I mean, the interesting thing is when people

15   approach obligations or responsibilities in that kind of

16   way, ultimately they suffer the most, and that's what

17   happened.

18       You know, at other times you would make great

19   strides, and you oftentimes would have great insight

20   although, you know, frankly, you would say things -- you

21   were smart enough to say things, you know, that would be

22   helpful for you as opposed to being honest.

23       Anyway, that's -- that's my perspective.  It's

24   mostly from the perspective of suggesting that this is

25   something that you should deal with when you are on

1     supervision, because you are going to be back here again

2     if you just don't accept "this is what I have to do to

3     get through supervision, and I can't manipulate around

4     this by saying things that people want to hear."

5                    THE DEFENDANT:  Right.

6                    THE COURT:  You know?  "I gotta accept it and

7     get through it."  You never did that, and -- anyway.

8          But on the other hand, you know, there were points

9     at which you were doing just extraordinarily well and

10    you were adding a lot to the community.  So it's a

11    mixed -- it's a mixed bag, frankly.  But tell me what

12    your plans are in the future.

13                   THE DEFENDANT:  As far as working and where I

14    live?

15                   THE COURT:  Yeah, as far as working, as far as

16    what happens when the, you know, prison term comes to an

17    end and you are in the community.  Where do you go?

18                   THE DEFENDANT:  Well, I plan on continuing

19    with counseling from the V.A.  I think that's -- stems

20    from a lot of my -- my bucking the authority and not

21    submitting to the program comes from.  And I bought a

22    house in Tennessee this summer, and I haven't been down

23    to see that yet, so I would like to go down to Tennessee

24    and live there until I decide to come up here and work

25    again.

1          THE COURT:  You bought a house in Tennessee?

2          THE DEFENDANT:  A small house, yes, your

3    Honor.  My brother lives in Tennessee, and his wife is

4    in real estate, and they found a tax sale for me that

5    borders their property.  We'd live together.  My brother

6    is also a marine, and so it's just really healthy -- he

7    doesn't drink or do drugs, and it will be a really

8    healthy place for me to be for like stable -- be around

9    my family because I don't have much family up here

10   anymore.

11         THE COURT:  So you think that you might be

12   moving to Tennessee?

13         THE DEFENDANT:  I would like to, yes, your

14   Honor.

15         THE COURT:  Okay.

16         THE DEFENDANT:  And I don't -- he's also the

17   CEO of a company down there, and -- you know, so I would

18   be working for him for the winter, or whenever I get

19   released.

20         THE COURT:  All right.  Anything else that you

21   wish to say?

22         THE DEFENDANT:  No, your Honor.

23         THE COURT:  Okay.  Mr. Perella?

24         MR. PERELLA:  Yes, your Honor.  With the

25   Court's permission, I would like to just introduce a few

1    of the law enforcement folks that have been on this

2    matter.

3              THE COURT:  Yes.

4              MR. PERELLA:  Sitting next to me is U.S. Fish

5    and  Wildlife Service Special Agent Eric Holmes.

6              THE COURT:  Okay.

7              MR. PERELLA:  We have two state fish and game

8    officials here:  Lieutenant Carl Wedin.  I hope I

9    pronounced that right.

10             LIEUTENANT CARL WEDIN:  Yes.  Thank you.

11             MR. PERELLA:  And Officer Robert Currier,

12   whose father is a -- oh, he is not here now.  His

13   father's a CSO here who you also know.

14        They are here because they know Mr. Ruhl well, all

15   too well.  And this notion that violating game laws is

16   while not within the letter of the lawful sporting

17   circumstances base offense level but sort of within the

18   spirit, the government rejects that completely.

19        Mr. Ruhl was not engaged in lawful sporting

20   practices.  He was hunting without a license, hunting

21   woodcock.  He was poaching a turkey, a protected

22   species, not even a game species.  Very hard to get a

23   permit if one is ever issued for that.  So Mr. --

24        There may be other reasons the Court would

25   determine the variance is appropriate.  The government

1    objects to that.  And to hold otherwise would be to

2    minimize the significance of fish and game violations.

3    And Mr. Ruhl just has a pattern of them, including a

4    poaching deer case that's now pending in state court

5    that is unresolved.

6         And as the government pointed out in its sentencing

7    memo, we learned a lot of good things about Mr. Ruhl in

8    drug court and what inspires him and what seems to be

9    good for his recovery.  So it is a significant

10   contradiction that Mr. Ruhl professes this affection for

11   Vermont mountains and forests and wildlife but is so

12   willing to take -- ignore those laws intended to protect

13   Vermont's environment when he decides.

14        Yes, it appears often he has relapsed when he is in

15   that mode, but there goes the point that he still has

16   not -- or there is the point that there is still a

17   significant risk of relapse.  And what happens when he

18   relapses?  He goes on lawless sprees.  Yeah, maybe he is

19   not dealing drugs or robbing convenience stores, but

20   it's significant offenses that he commits.

21        In short, your Honor, the government believes a

22   guideline sentence is appropriate.  We defer to you to

23   determine a fair and just sentence.

24             THE COURT:  I mean, to put the defense's

25   argument in perspective, I think what they were

1    suggesting is that he has been convicted of the

2    possession of a firearm by a felon, and ordinarily those

3    convictions are part and parcel of other offenses which

4    involve the distribution of drugs, and that was intended

5    sort of for that particular offense.

6        I don't think that they were minimizing -- I don't

7    think the defense was minimizing the other violations

8    here.  They're not asking for a reduction based upon the

9    fact that there were violations of fish and game laws.

10   I think what the defense was arguing is that he was not

11   using the guns in drug distribution activities, using

12   the guns to threaten other people.  I think that's what

13   they were suggesting, but that's --

14           MR. PERELLA:  And the government agrees with

15   that, but it's still that behavior of violating fish and

16   game laws that -- we all agree it's not in the letter of

17   the lawful sporting.  The government argues it's not

18   even within the spirit.  You are possessing a gun in

19   illegal ways.  There's certainly different degrees of

20   felonies that you commit with a gun, but the government

21   does not believe that's a legitimate ground for a

22   variance.  So --

23       Oh, and as to the -- I believe your Honor said that

24   you would address the possession of black powder weapons

25   when the time comes.  The government just notes that

1    he -- Mr. Ruhl may well be suspended for multiple years,

2    depending on the outcome of the state case, and have no

3    ability to get a hunting, fishing license.  And if he

4    doesn't possess a valid hunting, fishing license, the

5    government does not believe he should possess a black

6    powder gun even for target shooting, because we know

7    from his criminal history Mr. Ruhl's propensity to

8    violate fish and game laws, and -- but we can address

9    that at a later date.  Thank you

10          THE COURT:  All right.  Mr. Barth, do you want

11   to respond?

12          MR. BARTH:  No.  Thank you, your Honor.  We'll

13   stand on our arguments made earlier.

14          THE COURT:  All right.

15      All right.  Again, I have read the presentence

16   report.  I have read the sentencing memoranda of both

17   the government and the defense.  The Court has already

18   adjusted the criminal history category to level three.

19   That is -- because that more accurately reflects both

20   his risk of recidivism and also the seriousness of his

21   criminal conduct.

22      The final offense level was 12.  That means the

23   sentencing range would be reduced to 15 to 21 months.

24   The Court has granted -- will grant a request for a

25   non-guideline sentence.  I make a small adjustment based

1    upon that award.

2    And I want to say that in applying the 3553(a)

3    factors, there are both aggravating and mitigating

4    circumstances in Mr. Ruhl's case.  As far as aggravating

5    factors go, this is a possession of a firearm by a

6    person with a felony record, and it's also a really

7    significant violation of the fish and game laws.

8    What actually is true about the violation of the

9    fish and game laws is that this really stems out of what

10   Mr. Ruhl has expressed even in drug court, and that is

11   an effort to circumvent restrictions that he feels are

12   unfair.  And it goes with the migratory birds.  It goes

13   with having drug tests taken.

14   It's that -- it's that effort at manipulation and

15   obfuscation that gets Mr. Ruhl in such difficulties.

16   It's not being honest.  It's thinking that you can

17   circumvent the laws if you are smart enough and

18   persistent enough to do just that.  And that's -- that's

19   the heart of these violations, and it's the heart of why

20   he could not successfully complete drug court.

21   So I think that those are aggravating factors.  I

22   think, you know, the premeditation in regard to the

23   violation of the fish and game laws regarding migratory

24   birds is really serious because it's really -- it's

25   really a deliberate effort to circumvent restrictions.

1          And there are other mitigating factors.  You know,
2     you look at the violation of the drug -- or of the gun
3     charge, and, you know, that is not -- not involved --
4     it's not involving drugs.  It's not involving violence.
5     There's no effort in Mr. Ruhl's past to indicate that he
6     has been a violent person in any particular way.  This
7     was just because he felt he can do it.

8          So -- and I also looked back through his past.
9     This is a person who, at times, would make real efforts
10    at addressing his addiction and at other times would
11    not.  But there were more good times than bad, I
12    thought, during the course of his drug court experience,
13    and I think he is entitled to credit for that.

14         So what I wanted to do today is to fashion a
15    sentence which is reflective of the seriousness of the
16    conduct under 3553(a), also reflective of the
17    seriousness of the conduct while on supervision, because
18    he made efforts to continue to violate restrictions on
19    him, but also to reflect the fact that he was not a
20    particular danger to others and that he has potential,
21    if he ever comes to grips with his honesty, to be
22    extraordinarily successful.

23         So that's the balance, it seems to me, in imposing
24    a just sentence.  And the Court is going to adjust to
25    offense level 11, criminal history -- I'm sorry.  Yes,

1    11 -- criminal history category three.  Sentencing range

2    is 12 to 18 months.  And the Court finds as follows:

3         The offense of Count 1, felon in possession of a

4    firearm, in violation of 18 USC, section 922(g)(1), and

5    924(a)(2), occurred between in or about November of 2015

6    to in or about December of 2016.

7         The offenses of Counts 2 through 4, violation of

8    Migratory Bird Treaty Act, in violation of 16 USC,

9    section 703(a), 707(a), and 50 CFR 10 and 13, occurred

10   on or about March 18, April 18, and October 18.

11        The sentencing guidelines apply to Count 1 as

12   Counts 2 through 4 are Class B misdemeanors.

13        The guideline for Count 1 is found in 2K2.1.  The

14   person was a prohibited person.  Base offense level is

15   14.

16        Specific offense characteristics do not apply.  The

17   defendant has demonstrated an acceptance of

18   responsibility for this offense, and the offense level

19   is reduced to 12.

20        The defendant has 14 criminal history points,

21   resulting in a criminal history category of three.

22   Again, the Court has granted the adjustment to criminal

23   history category three.  That's -- the original criminal

24   history category of six, it's now adjusted to three.

25        And the guideline for level 12, that's before

1    adjustment, and criminal history category three, is 15

2    to 20 months.  The Court grants the defendant's request

3    to -- for a non-guideline sentence.  The Court adjusts

4    to a level 11, criminal history category three.  12 to

5    18 months is the sentencing range.

6        The guideline term of supervised release is one to

7    three years in Zone B.  Imposition of probation is not

8    authorized.

9        It is -- when adjusted to level 12, there is a

10   split-sentence option in this particular case.

11       It is the sentence of the Court the defendant be

12   committed to the custody of the Federal Bureau of

13   Prisons for a period of 12 months and one day, to be

14   followed by a two-year term of supervised release

15   relative to Count 1; and second, for the offenses in

16   Counts 2 -- six months to be run concurrently with

17   Count 1.

18       The conditions of supervision are as follows:

19       You must not commit another federal, state or local

20   crime.

21       You must not unlawfully possess a controlled

22   substance.  You must refrain from any unlawful use of a

23   controlled substance.  You must submit to one drug test

24   within 15 days of release from imprisonment or placement

25   on probation and at least two periodic drug tests

1    thereafter, as determined by the court.

2        You must cooperate in the collection of DNA as

3    directed by the probation officer.

4        You must comply with the standard conditions of

5    supervision adopted by this court.  These conditions are

6    imposed because they establish the basic expectations

7    for your behavior while on supervision and identify the

8    minimum tools needed by probation officers to keep

9    informed, report to the court about, and bring about

10    improvements in your conduct and condition.

11        You must submit your person, property, house,

12    residence, vehicle, papers, computers, other electronic

13    communications or data storage devices or media, or

14    office, to a search conducted by a United States

15    probation officer.  Failure to submit to a search may be

16    grounds for revocation of release.  You must warn any

17    other occupants that the premises may be subject to

18    searches pursuant to this condition.  An officer may

19    conduct a search pursuant to this condition only when

20    reasonable suspicion exists that you have violated a

21    condition of supervision and that the areas to be

22    searched contain evidence of this violation.  Any search

23    must be conducted at a reasonable time and in a

24    reasonable manner.

25        You must participate in substance abuse treatment,

1   which may include a substance abuse assessment with a

2   licensed substance abuse provider, and abide by any

3   programmatic treatment recommendations.  This program

4   may include testing to determine whether you have

5   reverted to the use of drugs or alcohol.  You shall

6   contribute to the cost of services rendered based on

7   ability to pay or the availability of third-party

8   payment.

9        You must refrain from the use of alcohol and other

10  intoxicants during and after treatment.

11       You must not engage in any hunting -- strike that.

12  Strike number H.

13       The guideline fine range is $5500 to $55,000.  The

14  defendant has demonstrated an inability to pay a fine,

15  hence all fines are waived.  Special assessments of $130

16  are imposed, due immediately.

17       Now the Court is going to recommend the following:

18       First, I'm going to recommend to the Bureau of

19  Prisons that the defendant be placed in a residential

20  reentry center and that he participate in a work release

21  program over the next approximate four months, is what

22  he has left to serve.

23       So I am going to recommend, first, that he go to an

24  R&R -- or RR, residential reentry facility, because not

25  only is it important that he get working but also that

1    he explore the options of whether he is going to move to

2    Tennessee, and this would give the Bureau of Prisons an

3    opportunity to plan out his release into the community.

4        Alternatively, if the Bureau of Prisons cannot get

5    him into either -- well, there's a number of residential

6    reentry centers in the northeast, that the Court

7    recommends that he go to a camp setting in light of the

8    lack of violence in his past.

9        Both the defendant and the government may have the

10   right to appeal this sentence as set forth in Title 18

11   US Code, section 3742.  If the defendant is unable to

12   pay the costs of an appeal, he has the right to apply

13   for leave to appeal *in forma pauperis* and request the

14   court to appoint counsel for him.  If the defendant so

15   requests, the clerk of court shall prepare and file

16   forthwith a notice of appeal on behalf of the defendant.

17   Notice of appeal by the defendant must be filed within

18   14 days of the date judgment is entered on the docket,

19   pursuant to Rule 4(b) of the Federal Rules of Appellate

20   Procedure.

21       All right.  Is there anything further from --

22           MR. BARTH:  Yes, your Honor.  Maybe my

23   hearing's starting to go.  I heard the Court impose on

24   Count 2 a sentence of six months concurrent to Count 1.

25           THE COURT:  And concurrent to Count -- yes, to

```
1     Count 1.  That's Count 2 and 4 -- through 4.
2               MR. BARTH:  Counts 2, 3 and 4.
3               THE COURT:  Right.
4               MR. BARTH:  All to be six months run
5     concurrent.
6               THE COURT:  Yes.
7               MR. BARTH:  Okay.  I'm sorry.  I missed -- I
8     just didn't hear that, your Honor.
9               THE COURT:  No, I probably didn't say it.
10    That's maybe why you didn't hear it.  But that's my
11    intention.  All of the remaining counts, six months
12    running concurrently with Count 1.  Total sentence is a
13    year and a day, recommendation that he get into a
14    residential reentry center, and alternatively, if that's
15    impossible, that he go to a camp.  I would suggest
16    Berlin, but -- in fact, I will add that, that it would
17    be to Berlin.
18              MR. PERELLA:  And the defendant, your Honor,
19    pled to an information, a four-count information, so the
20    government moves to dismiss the original indictment.
21              THE COURT:  Okay.  That's granted.
22         All right.  Is there anything further?
23              MR. BARTH:  No.  Thank you, your Honor.
24              THE COURT:  All right, Mr. Ruhl, what I have
25    tried to do is balance the positives and the negatives.
```

1    You have both.  And I have been honest about my reaction

2    to those negative comments:  your honesty, your

3    forthrightness, because they are one of your curses.

4    The only reason you are ultimately here is because

5    of that -- that lack of honesty and also that desire to

6    manipulate and circumvent any restrictions that are

7    imposed.  And you are going to be on federal supervision

8    at this point for two years.  You are going to have to

9    abide by terms and conditions; otherwise you will be

10   right back in court serving more time.

11        And I felt that -- that the sentence of 12 months

12   and a day is a just sentence earned by the nature of

13   your criminal offense and who you are.

14            THE DEFENDANT:  How much more time do I have

15   to serve?

16            MR. BARTH:  Judge, I can address that with Mr.

17   Ruhl.

18            THE DEFENDANT:  I also have a camp that I

19   went -- that I winterize each year, and it's not

20   winterized.  If it doesn't get done, I won't have a

21   place to -- I won't have a home here anymore.

22            THE COURT:  Well, you are going to have to try

23   to figure out with your lawyer how actually to resolve

24   that particular issue.

25            THE DEFENDANT:  Okay.

1          THE COURT:  All right?  You might be able to

2     get somebody else to go up and do that.

3          THE DEFENDANT:  All right.

4          THE COURT:  Okay.  Thank you.

5          (Court was in recess at 11:29 a.m.)

6                    *** ** ***

7

8

9

10               C E R T I F I C A T I O N

11        I certify that the foregoing is a correct
      transcript from the record of proceedings in the
12    above-entitled matter.

13                              _Anne Nichols Pierce_

14    April 12, 2022            _____
      Date                      Anne Nichols Pierce
15

16

17

18

19

20

21

22

23

24

25